[Cite as *Shaw v. Shaw*, 2024-Ohio-3231.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |  |
|---|---|---|---|
| KEVIN L. SHAW, | : | | |
| Appellant, | : | | CASE NO. CA2023-08-091 |
| | : | | O P I N I O N |
| - vs - | | | 8/26/2024 |
| | : | | |
| CHARLES W. SHAW, | : | | |
| Appellee. | : | | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DR98040692

The Lampe Law Office, LLC, and Stephen Otte, for appellant.

Eric D. Bender, for appellee.

**HENDRICKSON, J.**

{¶ 1} Kevin Shaw, appellant, appeals the decision of the Butler County Domestic Relations Court setting aside a Qualified Domestic Relations Order that had been in place for over 20 years. For the reasons that follow, we reverse the decision of the lower court.

**I. Facts and Procedural Background**

{¶ 2} Charles Shaw, plaintiff-appellee, and Sharon Shaw were married on August

25, 1973.  They had two children together: a son, Kevin, and a daughter.  Charles and

Sharon divorced in 1999.

{¶ 3}  They reached an agreement regarding the division of their property, which

the trial court adopted.[1]  Regarding Charles's federal civil service pension, the decree

provided the following:

> [Sharon] shall receive one half of [Charles]'s pension with the
> U.S. Postal Service.  A separate qualified domestic relations
> order shall issue to effectuate this division, and the court
> reserves jurisdiction to correct any defect in wording.

To implement this provision, in October 2000, the parties executed and filed a Qualified

Domestic Relations Order ("QDRO").

{¶ 4}  The QDRO contained several provisions beyond a simple 50/50 split of the

pension, including that Sharon would receive equivalent cost of living adjustments

("COLAs") and that she would receive a surviving-spouse annuity (with the costs split

equally).  Critically, a provision stated that if Sharon predeceased Charles, her share of

the benefits would pass to their surviving children:

> **8. Benefit Commencement Date:** The Former Spouse shall
> commence her benefits as soon as administratively feasible
> following the date this Order is approved as a Court Order
> Acceptable for Processing, or on the date the Employee
> commences his benefits, if later. Payments shall continue to
> Former Spouse for the remainder of Employee's lifetime.
> However, in the event that Former Spouse dies before
> Employee, the United States Office of Personnel
> Management is directed to pay Former Spouse's share of
> Employee's civil service retirement benefits to surviving
> children of the marriage, including any adopted children, in
> equal shares.  Upon the death of any child, that child's share
> will be distributed among the other surviving children.

The QDRO was prepared by Sharon's attorney and voluntarily signed by Charles.

---

1. The divorce decree pertinently stated that "[t]he parties . . . have entered an agreement regarding the property and alimony issues which the court finds just and equitable and hereby adopts."

**{¶ 5}** Sharon began to receive her portion of the pension in 2000, and for over 20 years, the parties operated under the QDRO without objection. Sharon received her share of the pension benefits ($1,100.50 each month) until her death in April 2022. Upon her death, Charles received a letter from the United States Office of Personnel Management informing him that, in accordance with the terms of the QDRO, Sharon's share of his pension benefits would now be paid to their children.

**{¶ 6}** This was not what Charles remembered as their agreement. In October 2022, he filed a motion under Civ.R. 60(B) to vacate the QDRO, arguing that it improperly modified the terms of the original divorce decree. Specifically, he contended that there was a defect in the provision stating that "in the event that the Former Spouse dies before Employee, the United States Office of Personnel Management is directed to pay Former Spouse's share of Employee's Civil Service retirement benefits to surviving children of the marriage." Kevin, the parties' son, opposed the motion.

**{¶ 7}** A hearing was held before a magistrate in April 2023. Charles testified that while he was represented by counsel when he signed the QDRO, he did not read it. Charles said that they were at the courthouse to address a spousal-support issue when his attorney came out of the conference room and told him to sign the QDRO. He also claimed that he never received a copy of the QDRO. According to Charles, he and Sharon never agreed that if she predeceased him, the pension benefits would go to their children. He said that he certainly did not intend to add benefits for his children. Kevin also testified. He said that he had been living with his mother before her death. Kevin said that he had barely spoken with his father since his parents divorced, as their relationship had been severely strained. He said that his mother had told him years ago that if she died before his father, he would receive her share of his father's pension

benefits.[2] Kevin testified that he had left his job to care for his mother before her death, and he was hoping to use those payments to buffer the financial sacrifice that he had made to care for her.

**{¶ 8}** The magistrate issued a decision recommending that Charles's motion be granted. The magistrate found that the relief Charles sought was actually to correct a clerical error under Civ.R. 60(A). The magistrate concluded that by providing a continuation of benefits to the parties' children if Sharon predeceased Charles, the QDRO did not conform with the final property-division order but improperly altered it. Therefore, the magistrate concluded, the QDRO was void. The magistrate ordered that a new QDRO be prepared to conform to the terms for division of retirement and pension benefits in the divorce decree. Kevin filed objections with the trial court. On July 19, 2023, the court overruled his objections and adopted the decision of the magistrate.

**{¶ 9}** Kevin appealed.

## II. Analysis

**{¶ 10}** Kevin assigns two errors to the trial court:

**{¶ 11}** Assignment of Error No. 1: "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT GRANTED APPELLEE/DEFENDANT'S MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO CIVIL RULE 60(B)(4) and (B)(5)."

**{¶ 12}** Assignment of Error No. 2: "THE TRIAL COURT ERRED AS A MATTER OF LAW IN FINDING THAT THE QDRO DID NOT REFLECT THE TERMS OF THE PARTIES' DECREE."

**{¶ 13}** The central issue here is whether the QDRO's provision allowing Sharon's

---

2. How the parties' daughter fits here is not clear. Based on the terms of the QDRO, she and Kevin presumably each receive half of Sharon's benefit. In any event, their daughter has not filed anything in this case and does not appear to be involved in this dispute.

share of Charles's pension benefits to pass to their children upon her death constitutes an impermissible modification of the divorce decree or a permissible clarification of it. Kevin contends that the QDRO is consistent with the decree's intent and ensures that Sharon receives her full "one half" of the pension for the duration of Charles's lifetime. Charles maintains that the QDRO added benefits for their children that were not contemplated in the divorce decree.

**A. The QDRO permissibly clarified the divorce decree**

{¶ 14} Retirement benefits accrued during marriage are marital assets subject to equitable division upon divorce. *See McKinney v. McKinney*, 142 Ohio App.3d 604, 608 (2d Dist. 2001), citing R.C. 3105.171. However, courts' ability to modify a division is constrained by R.C. 3105.171(I), which bars future modification of property division unless both spouses agree. *See Veidt v. Cook*, 2004-Ohio-3170, ¶ 10 (12th Dist.).

{¶ 15} A QDRO is an instrument born of the practical necessity to implement the division of pension benefits. *See Wilson v. Wilson*, 2007-Ohio-6056, ¶ 7 (stating that a QDRO "implements the court's decision of how a pension is to be divided incident to divorce or dissolution"). It serves as a bridge between the broad strokes of a divorce decree and the intricate mechanics of pension-plan administration. *See McKinney* at 608 ("A QDRO is a current distribution of the rights in a retirement account which is payable in the future, when the payee retires. It is ordinarily issued subsequent to and separate from the decree of divorce itself, after the employer payor has approved its terms as conforming with the particular pension plan involved"). As we have explained, "A QDRO is not an independent judgment entry of the court but is rather 'an enforcement mechanism pertaining to a trial court's previous judgment entry of divorce or dissolution.'" *Tekamp v. Tekamp*, 2019-Ohio-2382, ¶ 21 (12th Dist.), quoting *Ballinger v. Ballinger*, 2017-Ohio-7077, ¶ 6 (8th Dist.). It may not "vary from, enlarge, or diminish the relief that

the court granted in the divorce decree." *Wilson* at ¶ 18. A QDRO must remain faithful to the divorce decree's substance. *See Jewett v. Jewett*, 2014-Ohio-2343, ¶ 10 (12th Dist.). However, it may clarify and implement the terms of a decree without running afoul of the statutory prohibition against modification in R.C. 3105.171(I).

{¶ 16} "The question of whether a QDRO conflicts with a divorce decree presents a question of law that this court reviews de novo." *Tekamp* at ¶ 21, citing *Enty v. Enty*, 2017-Ohio-4177, ¶ 16 (8th Dist.). In scrutinizing whether a QDRO impermissibly modifies a decree, a court does not engage in a mere exercise of textual comparison. Rather, the court must discern whether the QDRO's provisions materially alter the rights and obligations established by the decree.

{¶ 17} The dispute here is not fundamentally over the QDRO but over the meaning of the divorce decree on which it was issued. The decree provision dividing Charles's pension benefits was a product of the parties' agreement, which the court had adopted, so the court could properly clarify any ambiguity in the provision without violating the prohibitions of R.C. 3105.171(I). *See McKinney*, 142 Ohio App.3d at 608-609. "An ambiguity exists when a provision in an order or decree is reasonably susceptible to more than one meaning." *Id.* at 609. The provision here states in full:

> [Sharon] shall receive one half of [Charles]'s pension with the
> U.S. Postal Service. A separate qualified domestic relations
> order shall issue to effectuate this division, and the court
> reserves jurisdiction to correct any defects in wording.

This language is broad and does not specify the precise contours of how the division was to be implemented. The QDRO, voluntarily agreed to by both parties, provided the necessary details to effectuate the pension-benefits division.

{¶ 18} We note that the magistrate here did not find the decree provision ambiguous and proceed to interpret or clarify it. Rather, the magistrate appeared simply

to make a legal conclusion that the QDRO modified the decree's division of pension benefits. We think that the magistrate erred in its conclusion. There is no conflict between the divorce decree and the QDRO.

{¶ 19} The divorce decree's succinct allocation of "one half of [Charles]'s pension" to Sharon leaves ample room for clarification without straying into impermissible modification. The QDRO's provision for the continuation of Sharon's share to their children, should she predecease Charles, neither expands her entitlement nor diminishes Charles's share. It merely elucidates the temporal scope of Sharon's "one half," ensuring that she receives the full measure of her award for the duration of the asset's existence. This interpretation aligns squarely with the divorce decree's language and the principles of equitable division that underpin marital-property law.

{¶ 20} The pension provision in the divorce decree is ambiguous on all the matters addressed in the QDRO. On the question of what happens if Sharon predeceases Charles, the decree can reasonably be interpreted to mean that pension payments cease or that they continue. The provision must be interpreted and clarified, which is what the QDRO does. By providing a continuation of benefits to the parties' children, the QDRO does not give Sharon any additional benefits.

{¶ 21} We emphasize that the provision allowing Sharon's share to pass to the children upon her death does not expand her rights or diminish Charles's share. It simply clarifies how Sharon's "one half" interest is to be handled in the event she predeceases Charles. This provision ensures that Sharon (or her estate) receives the full value of her share for the duration of Charles's lifetime, which is consistent with the decree's award of "one half of the pension."

{¶ 22} In reaching this conclusion, we distinguish this case from the cases relied on by Charles. In those cases, QDROs were found to overstep their bounds because

they improperly either awarded benefits that clearly were not contemplated by the decrees or altered fundamental calculations in the decrees. *See, e.g., Ostanek v. Ostanek*, 2021-Ohio-2319 (improperly awarded the additional benefit of a survivorship annuity); *Merz-Oliver v. Oliver*, 2003-Ohio-712 (12th Dist.) (improperly awarded gains and losses on divided 401[k] stocks); *Reynolds v. Turull*, 2019-Ohio-2863 (12th Dist.) (improperly changed the coverture fraction and added post-retirement enhancements and survivor benefits); *Adkins v. Bush*, 2003-Ohio-2781 (12th Dist.) (improperly awarded additional benefits not included in the decree). Instead, we find the present case more akin to those in which courts have approved QDROs because they provided necessary clarification of the decrees without improperly modifying them. *See, e.g., Jewett*, 2014-Ohio-2343 (permissibly interpreted the term "accrued benefits" to include both basic and supplemental pension-plan benefits).

{¶ 23} In sum, the QDRO here does not run afoul of R.C. 3105.171(I)'s prohibition on modifying divisions of property. The provision at issue simply implements a reasonable interpretation of what it means for Sharon to receive "one half of the pension." It stands as a permissible and indeed necessary clarification of the divorce decree's pension division, faithful to both the letter and spirit of the divorce decree.

## B. Latches and equity

{¶ 24} Even if we were to find the QDRO's provision stands in conflict with the decree, principles of equity and laches would compel us to deny relief after such a protracted period.

{¶ 25} The doctrine of laches serves as a bulwark against stale claims. It bars a party from asserting a right when two conditions are met: first, an unreasonable delay in pressing the claim, and second, resultant prejudice to the opposing party. *Connin v. Bailey*, 15 Ohio St.3d 34, 35 (1984). Both elements are abundantly present in the case

before us.

**{¶ 26}** Charles voluntarily signed the QDRO in 2000. He had ample opportunity to scrutinize its terms and voice any objections to perceived inconsistencies with the decree. Instead, he allowed the document to stand unchallenged for over two decades, during which time Sharon ordered her affairs in reliance upon its provisions. To set aside the QDRO at this late hour would visit substantial prejudice on Sharon, who had reasonably structured her expectations around her son's receipt of these benefits following her death. Moreover, Sharon cannot testify about what her agreement with Charles was concerning the pension benefits upon her death.

**{¶ 27}** Charles's protestations of ignorance regarding the specific provision about the children ring hollow. He should have thoroughly reviewed the QDRO far earlier. There is no evidence that would justify Charles not reading the QDRO before signing it. Moreover, Charles was represented by an attorney, whom he could have asked about the provision. His failure to undertake such a review for over 20 years epitomizes the kind of unreasonable delay that the doctrine of laches was designed to discourage.

**{¶ 28}** In the realm of domestic relations, perhaps more than any other area of law, there is a premium on finality and stability. To allow a challenge to a two-decade-old agreement at this juncture would not only offend principles of equity but would also sow uncertainty into countless settled divorces.

### C. Public policy considerations

**{¶ 29}** We cannot ignore public policy implications that our decision in this case may engender. The use of QDROs as instruments to clarify and implement divorce decrees is a common and essential practice in our judicial system. To permit challenges to these documents decades after their voluntary execution would be to invite chaos into an area of law where stability and finality are not merely desirable, but imperative.

{¶ 30} The ripple effects of a decision favoring Charles could be profound. It would potentially unsettle numerous cases with similarly concise divorce-decree language, opening a Pandora's box of litigation in what are thought to be long-resolved matters. The courts could find themselves inundated with opportunistic claims, undermining the very foundations of certainty and finality upon which our system of divorce settlements rests.

{¶ 31} Charles, in his argument, invokes the current state of Ohio law, which he contends favors QDROs that hew closely to the parties' agreements or the court's prior judgments. He posits that this policy should be maintained rather than upended. While we acknowledge the importance of fidelity to original agreements, we must also recognize the practical realities of divorce settlements and the role that QDROs play in their implementation.

{¶ 32} Charles further suggests that accepting Kevin's position might incentivize parties to submit non-compliant QDROs in hopes of "getting away with it." This argument, while not without merit, fails to fully appreciate the safeguards already in place within our legal system. Courts are well equipped to scrutinize QDROs at the time of their submission, and the doctrine of laches exists precisely to discourage the kind of delayed challenge that Charles himself now attempts.

### III. Conclusion

{¶ 33} The assignments of error are sustained. We conclude that the QDRO in this case did not impermissibly modify the divorce decree but instead provided necessary clarification. Furthermore, even if it had modified the decree, principles of equity and laches would bar Charles from challenging it over 20 years later. The trial court's decision is therefore reversed.

S. POWELL, P.J., and PIPER, J., concur.